* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca, and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. At the time of the alleged injuries giving rise to these claims, the parties were subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
2. At such time, an employment relationship existed between Plaintiff and Defendant-Employer.
3. Plaintiff alleges an injury to the back occurring on April 10, 2004. This denied claim has been assigned Industrial Commission File #526186.
4. Plaintiff sustained a repetitive bilateral hand injury on September 2, 2004. This accepted claim has been assigned Industrial Commission File #481733.
5. By Administrative Order of the Commission filed January 5, 2006, Plaintiff's alleged back claim and repetitive bilateral hand injury claims were consolidated for hearing purposes.
6. During all relevant times, Defendant-Employer was a self-insured entity. Risk Management Services, Inc. was the workers' compensation claims administrator for Defendant-Employer.
7. The Industrial Commission has jurisdiction of this matter.
8. Plaintiff contends her average weekly wage, as stated on the Form 60 filed November 18, 2004, is $482.72, yielding a compensation rate of $321.83. Defendant-Employer contends the Plaintiff's average weekly wage, as stated on the Form 22 dated May 9, 2005, is $458.47, yielding a compensation rate of $305.66.
9. Plaintiff received short-term benefits paid by Defendant-Employer pursuant to a Defendant-Employer funded short-term disability plan. Plaintiff received such benefits in *Page 3 
connection with the alleged back injury of April 10, 2004. Plaintiff received a total of $4,017.44 in benefits paid from May 12, 2005 to February 20, 2006.
10. Plaintiff returned to work for Defendant-Employer on February 21, 2006.
11. Plaintiff is receiving her full pre-injury wages.
12. Documents stipulated into evidence include:
 a. Medical records of Seagrove Medical Clinic;
 b. Medical records of The Johnson Neurological Clinic;
 c. Medical records of Randolph Hospital;
 d. Medical records of Hand Rehabilitation Specialists of North Carolina;
 e. Medical records of Greensboro Orthopaedic Sports Rehabilitation Center;
 f. Medical records of Millennium Neuroscience;
 g. Medical records of CompRehab;
 h. Medical records of HealthSouth;
 i. Recorded statement of Eva Daniel;
 j. Selected documents from Plaintiff's personnel file;
 k. Selected documents pertaining to the amount of short-term disability benefits paid to Plaintiff under Defendant-Employer's short-term disability plan;
 l. A copy of a check paid to Plaintiff for short-term disability;
 m. Copies of the Interrogatories and Request for Production served on the Defendant-Employer on February 21, 2006;
 n. Plaintiff's Responses Answers to Interrogatories;
 o. Medical expenses related to treatment of Plaintiff's back; and
 p. North Carolina Industrial Commission forms and pleadings. *Page 4 
 * * * * * * * * * * *
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 59 years old at the time of hearing before the Deputy Commissioner. She completed the seventh grade, and did not have any vocational training. Plaintiff had been employed as a deli worker by Defendant-Employer for approximately 12 years prior to the initial injury giving rise to these claims.
2. Plaintiff's claim for back and neck injury is premised on her contention that she sustained an injury to her back while working in Defendant-Employer's freezer. She testified at the hearing before the Deputy Commissioner that while taking a box off the shelf, she "lost it" and felt a pull in her back.
3. Debbie West, the deli manager, heard that box fall and asked Plaintiff is she was all right. Plaintiff responded that she was all right, and continued working the remainder of the shift. Ms. West testified that Plaintiff told her not to report the incident. Plaintiff was able to finish her work that day, and testified that she did not miss any work due to pain or problems with her neck or back between April 10, 2004, and May 5, 2005. Plaintiff further testified that she never spoke with her supervisors regarding her back treatment following the April 10, 2004 incident.
4. Wanda Smith, who was a co-worker of Plaintiff at the time of the alleged injury, testified that employees are trained to report injuries to management. Ms. Smith further testified that although she witnessed Plaintiff taking Tylenol the day after the alleged incident, Plaintiff *Page 5 
never said anything further about an alleged back injury after that day or that the medical treatment she was having was related to any incident of April 10, 2004.
5. Brett Lewis, the store manager on the day of the alleged injury, testified that he could not recall Plaintiff reporting any incident involving her back. He further testified that he could not recall Plaintiff ever requesting that Defendant provide her with medical treatment or other compensation for a back condition. He testified that plaintiff did report her carpal tunnel syndrome to him, and that she made no report of a back injury at that time.
6. Plaintiff claims to have first sought treatment for her back and neck pain on April 20, 2004 with Seagrove Medical Clinic. However, the April 20, 2004 medical record of Marty Mortimer, physician assistant to Dr. Kaur, references only a complaint of "joint pain in different joints off and on," and notes osteoporosis. There is no mention in the record of a specific complaint of neck or back pain, or of a work-related incident on April 10, 2004. Plaintiff was eventually diagnosed with bilateral carpal tunnel syndrome and was referred to William Gramig, M.D., a board-certified orthopedic surgeon specialty-trained in hand and microvascular surgery, for treatment.
7. Plaintiff treated with Dr. Gramig on August 12, 2004. Dr. Gramig, in his evaluation of Plaintiff for carpal tunnel syndrome, examined Plaintiff's cervical range of motion. He noted that Plaintiff had intact cervical range of motion that was pain free and without radicular symptoms.
8. On September 2, 2004, Dr. Gramig, while treating plaintiff's carpal tunnel syndrome, again performed an examination of Plaintiff's neck and back. He noted Plaintiff's neck and back to be non-tender. Dr. Gramig recommended Plaintiff proceed with a left carpal tunnel release. Dr. Gramig performed the left carpal tunnel release on October 1, 2004. *Page 6 
9. Defendant-Employer filed a Form 19 on November 18, 2004, reporting Plaintiff's bilateral carpal tunnel syndrome claim, and accepted the claim via a Form 60, filed on the same date.
10. On December 9, 2004, Plaintiff was noted to be doing quite well following her left carpal tunnel release, although she continued to experience carpal tunnel complaints in her right hand. Dr. Gramig recommended release of the right carpal tunnel. Dr. Gramig performed a right carpal tunnel release on January 18, 2005.
11. On March 17, 2005, Plaintiff returned to Dr. Kaur of Seagrove Medical Clinic with complaints of neck pain and knee pain and denied any complaints of back pain. On March 21, 2005, Dr. Kaur ordered an MRI of the cervical spine. The MRI revealed moderate posterior disc bulging at C4-C5 and mild posterior disc bulging at C5-C6. An MRI of the lumbar spine dated May 26, 2005, revealed disc space narrowing at T4-T5 with chronic appearing compression deformity of the T5 vertebral body.
12. Dr. Gramig declared Plaintiff at maximum medical improvement of her bilateral carpal tunnel syndrome on April 11, 2005. He released her to full duty work and assessed a permanent partial impairment rating of 2% to each hand. No further medical treatment was recommended related to Plaintiff's carpal tunnel syndrome.
13. During the course of Plaintiff's claim for carpal tunnel syndrome, Defendant learned that Plaintiff was obtaining unrelated treatment for back pain. Defendant filed a Form 61 on April 21, 2005, denying any medical treatment or disability not related to the diagnosis of carpal tunnel syndrome. Plaintiff, through counsel, filed a Form 18 on May 3, 2005, regarding the alleged incident on April 10, 2004, over one year prior to the filing of the Form 18. *Page 7 
14. Plaintiff admitted that she did not report the back incident as a workers' compensation claim until almost a year after she alleges the incident occurred, and acknowledged receiving medical treatment for her back for nearly a year without ever requesting that Defendant pay for this treatment. During the time she was treating for her back, Plaintiff was also treating for work-related carpal tunnel syndrome. When asked at the Deputy Commissioner hearing why she would file a compensation claim for her carpal tunnel syndrome but not for the alleged neck and back incident on April 10, 2004, Plaintiff stated that she had no answer.
15. Defendants paid Plaintiff temporary total disability benefits for her bilateral carpel tunnel syndrome from October 1, 2004, through April 17, 2005.
16. Plaintiff was evaluated by Dr. Applegate of Johnson Neurological Clinic on June 17, 2005, upon referral by Dr. Kaur. Dr. Applegate reviewed the MRI's of the cervical and lumbar spine and diagnosed cervical spine stenosis and low back pain. Plaintiff, for the first time, reported her back pain as beginning approximately two weeks after she lifted something at work and heard a pop. Dr. Applegate treated Plaintiff between June 17 and November 21, 2005. As of November 21, 2005, Dr. Applegate recommended that Plaintiff have an epidural steroid injection. As of the date of the hearing before the Deputy Commissioner, Plaintiff had not returned to Dr. Applegate and had not had the epidural steroid injection.
17. A review of the record shows that none of Plaintiff's medical records from Seagrove Medical Clinic reference any report by Plaintiff that the neck and back pain began following a work-related incident occurring on April 10, 2004. The Full Commission finds that the first time plaintiff reported a lifting incident to any medical provider was when she treated with Michael Applegate, M.D., on June 17, 2005, after she had filed her workers' compensation *Page 8 
claim. Furthermore, the record shows that Plaintiff has offered conflicting descriptions of where she initially felt a pop in her back. In her recorded statement to the adjuster when she first filed a back claim related to the alleged April 10, 2004, Plaintiff described feeling a pop in her back that was in the middle of her back and described it as being "where you fasten your bra." However, at the hearing before the Deputy Commissioner in this matter, Plaintiff placed her finger on her neck just above her shoulders and testified that the pain began from that upper location across her shoulders and up into her neck.
18. In light of Plaintiff's inconsistent testimony regarding the onset of her carpal pain on April 10, 2004; the fact that Plaintiff never reported a back injury to her employer until over a year after the alleged incident despite the fact that she had an ongoing carpal tunnel claim; and the fact that Plaintiff made no mention of an April 10, 2004 work-related incident to any of her medical providers until after her back claim was filed, the Full Commission finds that plaintiff has failed to show that she sustained an injury by accident, or specific traumatic incident, to her neck and back on April 10, 2004.
19. Mr. Mortimer testified that the results of cervical x-rays performed one month after the alleged April 10, 2004 incident revealed degenerative changes caused by arthritis. He testified that the location where Plaintiff stated she felt the pop in her recorded statement would be associated with the thoracic spine, and further testified that a "pop" felt in the thoracic spine would not likely cause bulges in the cervical spine. Mr. Mortimer did give favorable testimony to Plaintiff on the issue of causation; however, the Full Commission finds that his opinion was admittedly based on the assumption that the incident occurred as Plaintiff described it to him. Furthermore, Mr. Mortimer admitted at deposition that his medical records and notes contain no report by Plaintiff to him that her neck pain began after an alleged work-related incident on April *Page 9 
10, 2004. Based upon the totality of Mr. Mortimer's testimony, and in light of the fact that his opinion was based upon on the assumption that the April 10, 2004 incident occurred as Plaintiff described it to him, the Full Commission finds that the testimony of Mr. Mortimer fails to show a causal relationship between plaintiff's back condition and the alleged work-related incident on April 10, 2004.
20. Dr. Applegate also testified in this matter and was of the opinion that the compression deformities noted on Plaintiff's lumbar MRI pre-dated the alleged April 10, 2004 incident. He testified that Plaintiff's osteoporosis could cause compression deformities. Dr. Applegate also reviewed Plaintiff's cervical x-rays and was of the opinion that the chronic degenerative changes noted on the x-ray could account for the disc bulges noted on Plaintiff's cervical MRI, and that these degenerative changes likely pre-dated the alleged April 10, 2004 incident. Dr. Applegate did give favorable testimony to Plaintiff on the issue of causation; however, the Full Commission finds that his opinion was admittedly based on the assumption that the incident occurred as Plaintiff described it to him. Dr. Applegate did not evaluate Plaintiff until over one year after the alleged injury, and the Full Commission notes that it is Dr. Applegate's medical records that contain Plaintiff's first report that the neck and back pain began after the alleged April 10, 2004 incident. Based upon the totality of Dr. Applegate's testimony, and in light of the fact that his opinion was based upon on the assumption that the April 10, 2004 incident occurred as Plaintiff described it to him, the Full Commission finds that the testimony of Dr. Applegate fails to show a causal relationship between plaintiff's back condition and the alleged work-related incident on April 10, 2004.
21. In regard to Plaintiff's carpal tunnel syndrome, Plaintiff presented to Dr. Scott Spillmann, of Wake Forest University Baptist Medical Center's CompRehab, on August 23, *Page 10 
2005, for a second opinion regarding her impairment rating. Dr. Spillmann reviewed Plaintiff's medical records and conducted an examination. Dr. Spillmann diagnosed bilateral carpal tunnel syndrome, status post bilateral release with continued pain and some weakness. He noted Plaintiff to be at maximum medical improvement and assessed a five-percent (5%) permanent partial impairment rating to the left hand and a five-percent (5%) permanent partial impairment rating to the right hand. The Full Commission gives greater weight to the permanent partial impairment ratings of five-percent (5%) for each hand given by Dr. Spillman, than those given by Dr. Gramig's physician assistant because Dr. Spillman incorporated findings from a functional capacity evaluation conducted by Alex Arab, P.T.
22. Regarding plaintiff's average weekly wage in relation to her carpal tunnel syndrome claim, Plaintiff contends her average weekly wage, as stated on the Form 60 filed November 18, 2004, is $482.72. Defendant contends the Plaintiff's average weekly wage, as stated on the Form 22 dated May 9, 2005, is $458.47. Based on a review of the record in this matter, the Full Commission finds Plaintiff's average weekly wage to be $458.47, as listed on the Form 22, which yields a compensation rate of $305.66.
23. Based on the totality of the evidence of record, the Full Commission finds that Plaintiff has failed to show that she sustained an injury by accident, or suffered a specific traumatic incident, to her back and neck on April 10, 2004. Defendant-Employer did not have actual notice of an injury occurring on April 10, 2004, and Plaintiff has shown no reasonable excuse for the delay in providing written notification to Defendant. Because Plaintiff did not file a claim regarding the alleged April 10, 2004 incident until over a year after it occurred, Defendants were prejudiced by her untimely notice. Further, even if Plaintiff's description of the alleged incident were taken to be true, Plaintiff has failed to show to a reasonable degree of *Page 11 
medical certainty that her neck and back condition are causally related to the alleged April 10, 2004 incident.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained the admittedly compensable occupational disease of bilateral carpal tunnel syndrome for which Defendant has duly provided indemnity and medical compensation. Plaintiff is entitled to receive permanent partial disability compensation at the weekly compensation rate of $305.66 for the five percent (5%) permanent partial impairment rating to each hand. N.C. Gen. Stat. § 97-31(12).
2. In light of Plaintiff's inconsistent testimony regarding the onset of her pain on April 10, 2004; the fact that Plaintiff never reported a back injury to her employer until over a year after the alleged incident despite the fact that she had an ongoing carpal tunnel claim; and the fact that Plaintiff made no mention of an April 10, 2004 work-related incident to any of her medical providers until after her back claim was filed, the Full Commission concludes that plaintiff has failed to show that she sustained an injury by accident, or specific traumatic incident, to her neck and back on April 10, 2004. N.C. Gen. Stat. §97-2(6).
3. Defendant-Employer did not have actual notice of an injury occurring on April 10, 2004, and Plaintiff has shown no reasonable excuse for the delay in providing written notification to Defendant. Because Plaintiff did not file a claim regarding the alleged April 10, 2004 incident until over a year after it occurred, Defendants were prejudiced by her untimely notice. N.C. Gen. Stat. § 97-22. *Page 12 
4. Even if Plaintiff's description of the alleged incident were taken to be true, the Full Commission concludes that Plaintiff has failed to show to a reasonable degree of medical certainty that her neck and back condition are causally related to the alleged April 10, 2004 incident.See Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003).
5. Plaintiff is entitled to receive from Defendant medical treatment for her bilateral carpal tunnel syndrome that is reasonably necessary to effect a cure, provide relief, or lessen the period of disability; however, Plaintiff's is not entitled to receive from Defendant treatment for her unrelated neck and back conditions. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
6. Defendant is entitled to a credit for any overpayment of benefits that were paid to Plaintiff at the incorrect average weekly wage listed on the Form 60. N.C. Gen. Stat. § 97-42.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to Plaintiff permanent partial disability compensation at the weekly compensation rate of $305.66 for the five percent (5%) permanent partial impairment rating to each hand. Any compensation that has accrued shall be paid to Plaintiff in a lump sum. This award is subject to the credit and attorney's fee provided herein.
2. Defendant shall provide to Plaintiff medical treatment for her bilateral carpal tunnel syndrome that is reasonably necessary to effect a cure, provide relief, or lessen the period of disability. Defendant shall not be required to provide medical treatment for plaintiff's unrelated neck and back conditions. *Page 13 
3. Defendant is entitled to a credit for any overpayment of benefits that were paid to Plaintiff at the incorrect average weekly wage listed on the Form 60.
4. Defendant shall pay directly to Plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded to Plaintiff, subject to the credit awarded to Defendant herein. The portion of attorney's fees that is based upon compensation that has accrued shall be paid to Plaintiff's counsel in a lump sum; thereafter, Plaintiff's counsel shall receive every fourth check of compensation due Plaintiff.
5. Each side shall bear its own costs; however, Defendant shall pay expert witness fees in the amount of $500.00 to Dr. Applegate; $200.00 to Mr. Arab; and $225.00 to Dr. Mortimer, if not paid by prior order.
This 13th day of November 2007.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1